Matter of Lakeside Family & Children's Servs. v Conchita J. (2005 NY Slip Op 52056(U))

[*1]

Matter of Lakeside Family & Children's Servs. v Conchita J.

2005 NY Slip Op 52056(U) [10 Misc 3d 1060(A)]

Decided on December 7, 2005

Family Court, Queens County

Richroath, J.

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and will not be published in the printed Official Reports.

Decided on December 7, 2005

Family Court, Queens County
In the Matter of a Termination of Parental Rights Proceeding Lakeside Family and Children's Services, Petitioner
against
Conchita J., Respondent.
B 14841-02

Marybeth S. Richroath, J.
On December 24, 2001, Hon. Fran L. Lubow of this Court, adjudicated the subject child, Portia J.[FN1] a neglected child in a 59- page written decision outlining the history of the neglect case as well as the dispositional orders issued by the Court on the same date. At that point, Portia had been in care since November 24, 1997.
Judge Lubow's dispositional order was quite clear. It required that:
1. The children be placed in care for 12 months pursuant to FCA Section 1055;
2. Respondent be placed under ACS supervision pursuant to FCA Section 1057 for 12 months;
3. An order of protection issue against respondent in favor of the children providing that she shall not interfere with their care and custody by ACS or its agent and shall have only supervised visitation with the children at the agency pursuant to FCA Section 1056 and that respondent was required to comply with the terms and conditions specified in said order of protection which was incorporated into the dispositional order;
4. Respondent submit to a full psychological/psychiatric/neurological evaluation, the results of which were to be authorized by her to be released to ACS and the Court and which were to be utilized to formulate a further plan for appropriate intervention services to which respondent may be referred and with which she was expected to comply;
[*2]
5. Respondent was to establish and maintain a verifiable place of residence and keep ACS/Agency apprised of her residence at all times, as well as a means of reliable communication, i.e. mailing address, telephone number etc.
6. Respondent was to establish a verifiable source of income;
7. Respondent was to authorize the release of all information to ACS and the Court in order to verify all of the above;
8. The subject children and respondent were to be scheduled for regular bi-weekly visitation at the agency and that respondent was expected to visit in accordance with the schedule;
9. Respondent was to be notified of the planning conferences to be held with respect to the children, of the right of respondent to attend such conferences and the right of respondent to be accompanied by counsel or other person;
10. The subject children were to continue to receive therapy;
11. ACS was to undertake diligent efforts to encourage and work with respondent in an effort to effectuate the discharge of the children to her care and respondent was to cooperate, as well, in that regard;
12. The warrant for the return of the child Eddie to foster care was continued;
13. ACS was to submit written progress reports to the Court, respondent and the Law Guardian concerning the status of respondent and the children and the implementation of the Court's order;
14. ACS was to file a petition for a permanency hearing. In the Matter of Eddie J. & Portia J., Fam Ct, Queens County, Dec. 24, 2001, Lubow,J., Docket No. N16631-2/97 at 57-59.
Respondent appealed Judge Lubow's finding and orders. The Appellate Division dismissed respondent's appeal on March 17, 2003. Leave to appeal to the Court of Appeals was denied on January 13, 2005.
Based upon respondent's failure to comply with the provisions of the dispositional order on the neglect case, on October 9, 2002, the agency filed a petition to terminate respondent's parental rights, alleging that she had permanently neglected Portia. Testimony at the fact-finding on that petition was taken on January 6, 13, 20, May 12, 19, August 5, 9, September 15, and November 22, 2004 and May 27, 2005. Counsel for the agency, counsel for respondent and the law guardian presented summations to the Court on August 30, 2005.
Lakeside Family and Children's Services' caseworkers Roan Tinglin and Intracta Robinson were called as witnesses by the presentment agency; respondent testified on her own behalf and also called Assistant Commissioner Gail Hallerdan of the New York State Office of Children and Family Services. The Law Guardian did not present independent evidence.[FN2] The [*3]Court took judicial notice of all proceedings on the neglect docket involving respondent mother and the subject child, Portia, as well as her brother, Eddie, up to and including the filing date of this petition.
THE PRESENTMENT AGENCY'S CASE AT FACT-FINDING
Intracta Robinson testified that she was the caseworker from Lakeside Children and Family Services assigned to Portia's case from 2000-2002. Ms. Robinson testified that the service plan designed to re-unite respondent with Portia required that respondent visit regularly with the child, provide the agency with her address, verifiable income and a backup resource who would watch Portia when respondent was not available, or working.
Ms. Robinson testified that she asked respondent for her address whenever she saw respondent, at least bi-weekly at her visits with her child. On the first occasion, in 2000, when Ms. Robinson asked respondent for her address, respondent told the caseworker that the "agency had her address" and it was "where you mail my letters to." Ms. Robinson recounted telling respondent that she sent those letters to a post office box, and that the reason the agency needed an address was so that they could inspect the home and make sure that it was suitable for reunification of parent and child. Ms Robinson testified that though she asked respondent for her residence address at least twice a month for the two years she was the caseworker for Portia, respondent never provided an address. The caseworker recounted some specific conversations between herself and respondent concerning the address issue.[FN3] She stated that respondent told her "you have my address already;" respondent changed the subject to address dental issues Portia had; or respondent cursed at the caseworker. In any event, in the two years Ms. Robinson worked with the J. family, she never obtained a residence address from Conchita J..
Ms. Robinson testified that the agency reimbursed Ms. J. for carfare when she attended visits. On occasion, respondent complained that she was not receiving sufficient reimbursement for her travel expenses. Ms. Robinson queried respondent with respect to her residence information in this context as well, explaining that if she had documentation of where respondent was traveling from, she could justify additional reimbursement for travel expenses. However, respondent never produced any documentation, and Ms. Robinson continued to provide respondent with metrocards with round-trip carfare to reimburse her when she came to visits with Portia.
In the same way, Ms. Robinson stated that she attempted to obtain income verification from respondent. In answer to Ms. Robinson's questions, on one occasion respondent replied that she was in the Air Force reserves; however, respondent never provided any written documentation of that statement. On the same schedule during which Ms. Robinson requested [*4]respondent's address, at least twice per month for almost two years, Ms. Robinson also asked respondent for documentation of her income. Respondent never provided the documentation. Ms. Robinson recounted that in October 2001 there was a meeting with the New York State Office of Children and Family Services. After that meeting, respondent told Ms. Robinson that she provided the income verification to the state. When Ms. Robinson told respondent that the state denied receiving any verification of her income from her, respondent told Ms. Robinson that "they are liars." Ms. Robinson testified that she never received income verification from respondent.
Ms. Robinson testified that respondent attended visitation with Portia regularly and enjoyed positive interaction with her daughter. However, Ms. Robinson testified that respondent's interactions with staff were "horrible" and her conduct during the visits was sometimes bizarre. On one occasion, respondent was troubled by the appearance of Portia's hair, and proceeded to bring her to a public restroom and wash Portia's hair in the sink. On other occasions, while continually complaining about the agency's lack of attention to Portia's dental needs, she brought bags of candy which Portia would devour during the course of each visit.
Ms. Robinson testified that she asked respondent to identify her child care provisions for Portia; respondent refused and never provided Ms. Robinson with that information.
Cross examination focused on respondent's contention that the agency already had a Bronx address for her. Ms. Robinson denied knowing that respondent had such a residence address. The caseworker stated that she never investigated to determine independently what respondent's residence address was, for example by asking her for a driver's license, requesting voting records or post office information, electric or telephone bills; it was expected that respondent should provide it to the caseworker. Respondent never did. On cross examination, Ms. Robinson noted that "everyone" tried to get a residence address from respondent, and she was unaware that anyone had succeeded. She recounted appearing with respondent in Court before Judge Lubow on numerous occasions. At each appearance Judge Lubow asked respondent where she lived; on each occasion respondent refused to answer the question.
On cross examination Ms. Robinson stated that she did not refer respondent for psychiatric treatment because she "knew it had been addressed." Her understanding was that respondent had been through "some sort of psychological counseling" and the caseworker did not want to require respondent to repeat services that she had already completed.
The law guardian also conducted cross examination of Ms. Robinson. Through that questioning he established that although Ms. Robinson's agency, the Court and a state agency all questioned respondent in an attempt to ascertain her residence address, none were successful in identifying that address while Ms. Robinson was the caseworker on this matter. Ms. Robinson testified that in her seven years as a caseworker, this case was unique in that regard. Ms. Robinson testified that respondent deliberately withheld information, was evasive and nasty as she attempted to do her job. Ms. Robinson also testified that she genuinely wanted to re-unite Ms. J. and her daughter but was unable to because of Ms. J.' unwavering refusal to provide information to the agency that was necessary to effectuate that reunification.
The agency also called Roan Tinglin as a witness. Ms. Tinglin testified that she was the caseworker assigned to the J. matter from March 2002 through the filing of the TPR petition on October 9, 2002. At the time she became the caseworker on the J. matter, the service plan [*5]required that respondent provide the agency with her residence address; provide the agency with her means of support for the children; provide information to the agency as to who would take care of the children while respondent was working if and when the children were discharged to respondent's care; and provide a psychological evaluation report from Mental Health Services.
Ms. Tinglin testified that the agency needed respondent's address so that the agency could make a home visit and insure that the residence was appropriate for return of the children. She stated that within a week or two of being assigned to the case, she contacted respondent by telephone, discussed the visitation schedule and told respondent that she needed a street address for her. Ms. Tinglin recounted telling respondent that correspondence was being sent to a post office box in Cookstown, New Jersey, and one of the requirements for re-unification was that Ms. Tinglin make a home visit to respondent's residence. Ms. Tinglin testified that respondent told her that she did not have an address that the agency could visit.
Ms. Tinglin testified that there was a service plan review meeting held in the beginning of April 2002. Respondent was invited to the meeting, but did not attend. Representatives of ACS and the agency were present, as were Portia and the foster mother. Respondent's service plan was discussed, as were the requirements she needed to fulfill in order for Portia to return home. At the conclusion of the meeting, Ms. Tinglin sent a letter, with the service plan requirements and the visitation schedule to respondent's post office box. In addition, she hand delivered the letter to respondent on April 12, 2002.
Ms. Tinglin also testified that respondent was verbally abusive to her when she interacted with her at her visits. She stated that respondent was "always fighting with her" and on numerous occasions called her a "lying motherfucker" and a "green-card toting bitch" when she attempted to discuss the various service plan requirements with her. Ms. Tinglin testified that respondent's use of these expletives took place front of the subject child, Portia, and other families with children that were visiting at Lakeside. Ms. Tinglin recounted at least one occasion when respondent got into a "fight" with another birth parent during visitation at Lakeside, and another occasion when respondent had to be removed from Lakeside's premises by the police.
Ms. Tinglin testified that in addition to the letters mailed to respondent's post office box, she hand delivered a letter with the requirements to respondent approximately once a month at the Lakeside agency when respondent visited with Portia. In spite of all of these efforts, at the time the instant petition was filed in October 2002, Ms. Tinglin had not been successful in ascertaining respondent's residence address. Respondent had not disclosed her employment or provided verification of her income. Respondent had not provided the agency with any proposed babysitters who would look after Portia while respondent worked. Moreover, Ms. Tinglin testified that between March 2002 and October 2002, respondent did not participate in or submit to any psychological examinations.
On cross-examination respondent contended that as early as October 25, 1999, caseworkers from Lakeside had visited respondent on East 181 Street, Bronx, New York, and found her residence appropriate. Ms. Tinglin noted in response that while the residence was approved by the agency, J. Lubow had required that respondent produce a lease and permission from her sister to live at that residence, which according to respondent, was not in respondent's name. Ms. Tinglin testified that as far as she was aware, neither the lease nor the sister's permission had ever been produced. Thus, she continued to ask respondent to identify her [*6]residence address.
Respondent's counsel asked whether Ms. Tinglin was aware that respondent had been referred to and completed counseling with a Dr. Maynard. While Ms. Tinglin was familiar with the doctor's name, she stated that when she became the caseworker on the J. matter, her understanding was that none of the service plan requirements had been completed. The various documents relevant to Dr. Maynard received into evidence on respondent's case all dated from 1999 and 2000.[FN4] None stated that Ms. J. had been evaluated or had successfully completed counseling.
Respondent's counsel confronted Ms. Tinglin with a document on Lakeside stationery (Respondent's E in Evidence), a form letter dated July 12, 2000, referring respondent to Golden Opportunities for housing, which stated, "[c]urrently, the only barrier to children's foster care discharge is the lack of housing [;] there would not be any further need for foster care placement if the above-named client secured adequate housing."[FN5] Ms. Tinglin reiterated that when she was assigned the case, and throughout her tenure on the case between March and October 2002, respondent failed to complete any of the service plan requirements.
 RESPONDENT'S CASE AT FACT-FINDING
Respondent called Gail Hallerdan, an Assistant Commissioner at the New York State Office of Children and Family Services ("OCFS"). Ms. Hallerdan testified that she became aware in 2000 that respondent was making complaints about ACS and Lakeside to OCFS, and she was involved personally with respondent's case in 2001 and 2002. A/C Hallerdan appeared before Judge Lubow in Queens County Family Court, was aware of or attended numerous meetings concerning respondent's case, and had her staff investigate numerous complaints registered by respondent. A/C Hallerdan testified that in her opinion, regardless of how difficult a parent might be, it was the agency's duty to work with that parent to try to achieve permanency for the child. She was concerned that Portia appeared to be "rotting in foster care" due to personality difficulties that the agency had with respondent. A/C Hallerdan took it upon herself to write to the military and attempt to verify respondent's employment and income.
The result of A/C Hallerdan's efforts was memorialized in affidavit sworn to on April 28, 2003 and received into evidence, over objection, as Respondent's J in Evidence. A/C Hallerdan obtained a copy of Eddie's birth certificate from Lakeside, identified respondent's maiden name from that document, and contacted military authorities to ascertain whether they had an individual known as Conchita J. or Conchita B. working for them. Within a matter of days, she successfully contacted a Master Sergeant at the Judge Advocate General's Office at McGuire Air Force Base in New Jersey and after following his instructions to file a FOIL request, ascertained that as of April 18, 2003, respondent was employed under the name Conchita B. as an active member of the United State Air Force Reserve, stationed at the Aeromedical Staging Squadron, McGuire Air Force Base, New Jersey. She confirmed respondent's wages for 2002 as $8068.68. A/C Hallerdan's request for respondent's address and birth date were denied under the Privacy [*7]Act of 1974.
Respondent testified on her own behalf. On direct examination respondent stated that she had worked in the Department of Defense for the Air Force from 1980 to the present, under her maiden name, Conchita B. Between April and October 2002, she worked for that entity at McGuire Air Force Base. She showed, and had received into evidence as Respondent's M, a copy of her identification card. Respondent testified that she continued to use her maiden name after she married in 1984. Respondent testified that she was still married. Respondent stated that she did not sign any release for A/C Hallerdan to acquire the information she provided in Respondent's J in Evidence; she did not even know that the assistant commissioner was taking steps to independently acquire that information. On the residence issues, respondent contended that she kept an address in the Bronx that was available for Portia to be released to, that the agency had inspected that apartment and found it suitable for Portia's residence. She stated that she had been referred by the agency to Dr. Maynard for psychological services and she had complied with them. She stated that she had completed every referral required by the agency and that she had done everything the agency required to achieve the return home of her daughter.
She testified that the agency refused to return Portia to her because of a deep seated prejudice against people of color that was well documented in lawsuits and the media.[FN6]
On cross examination by the agency, respondent denied being asked for an address by the caseworkers on many specific dates. She testified that although she enlisted in the Air Force in 1979 or 1980 (she could not remember), she could not remember when she had most recently re-enlisted or when her current term of enlistment expired. She testified that at various points between 1980 and 2002, she served in the Air Force, the NY Army National Guard, and the Army Reserve. She testified that although she gets paid by the military, it is not on a regular basis, she is paid whenever she gets a "leave and earnings statement." In answer to a question as to whether she might have one or more of those statements in her possession, she stated, jovially, that she's been shredding a lot of documents and she was not sure what had been shred and what had not. She refused to provide the name of her commanding officer, claiming that she was precluded by a non-disclosure agreement she had signed with the military.
On cross examination by the Law Guardian, respondent stated that she did not recall when she moved to the Bronx, and admitted that since she moved to the Bronx, she "possibly" could have lived elsewhere. She testified that at least from December 24, 2001 through October 9, 2002, she had "maintained a home in the Bronx" and that in fact she had maintained that home since the first home visit to that apartment by the agency in the 1990's. Despite this longstanding residence, she stated that she did not know how much the rent was; she did not know if there were a lease, but said that if there were, it was in her sister's name; she did not know who pays the electricity or in whose name the account was; she did not know who pays the gas bill, how much it was or under whose name the account was; she denied having a telephone in the apartment, saying that her sister had a telephone in the apartment but she did not know how much the bill was or who pays it. Respondent stated that she did not have a cell phone, [*8]although she borrows one from time to time, and she stated, in answer to a question, that sometimes she borrows her son, Eddie's, cell phone. When asked when she had last seen Eddie, respondent took the 5th Amendment. Respondent stated that in 2002 she carried a beeper, but although the agency had the number, they did not contact her very frequently using it.
Respondent testified that between March and October 2002 her job location was McGuire Air Force Base. She did not know how long it took to travel between the base and the Bronx apartment. She stated that Cookstown New Jersey was in fact opposite from the base, and agreed that she did occasionally receive and send mail in 2002 from an address in Cookstown, New Jersey. She denied living in Trenton, New Jersey, testified that it was possible that she had lived in a housing complex in Lumberton, New Jersey in 2002, but said "I live wherever I am at the time."
When asked directly by the Law Guardian why Portia was still in placement, respondent stated that, "Lakeside wants to keep them in foster care to keep making money." The Law Guardian asked respondent what her plan was for the return of her children in 2002. Respondent testified that she would make sure that her children were well fed, well cared for and that they were never on the street. When confronted by the Law Guardian with the direct provisions of J. Lubow's dispositional order, respondent denied ever reading it, claiming that she sent it directly to an attorney for an appeal. She testified that she did not recall being required to provide a verifiable income or residence/mailing address and she specifically denied ever being asked to provide such by any of the caseworkers assigned to the case. Respondent claimed that she had done "all she could do" to cooperate with the agency so that Portia would be returned to her care. As an example, respondent stated that she even took parenting skills classes that she did not need, considering that her children, prior to their removal from her care, were on the honor roll, well fed, well clothed and well cared-for.
Respondent testified that she did not recall any order for a psychological or neurological evaluation as a result of J. Lubow's order, but then stated that she did remember a meeting in the ACS offices where such an evaluation was mentioned, and an ACS official told her that Lakeside would give her a referral for the evaluation, and Lakeside never did. The Law Guardian asked what the barriers were to her getting these evaluations on her own. Respondent testified that the obstacles were two-fold: financial (the evaluations were expensive) and OCFS had told her that Lakeside was supposed to refer her for the evaluation and pay for it. The Law Guardian explored respondent's payment for private counsel to appeal the decision and respondent conceded that those bills did amount to thousands of dollars, but stated that she had payment plans for them, and she did not believe that doctors had payment plans. Respondent claimed that she had made inquiries to get a psychiatric/psychological/neurological evaluation at NYU, but they wanted to be paid up front and it would have cost her over a thousand dollars. In answer to the Law Guardian's questions, respondent stated that she could not remember if she had been in therapy in 2002, she did not remember being interviewed by Dr. Mongeaux in the Courthouse and she knew she had gone to Dr. Maynard for therapy at some point while the case was pending but she did not remember when. She did not remember going to any other mental health professional in connection with her cases in Queens Family Court.
Respondent mother testified that if Portia were returned to her, she would live with respondent in the Bronx apartment. Respondent would commute to her job in the military, which [*9]"could be anywhere." When the Law Guardian posited a situation where respondent was ordered to deploy on short notice, and required to be away from her family, respondent disputed his assumptions. When asked who would have taken care of Portia in 2002, respondent stated that she had a number of babysitters, any of whom would have been suitable, and she testified that she had presented kinship resources to Lakeside, who had not been considered by the agency, her sister, and an unnamed friend who is a school teacher. When the Law Guardian asked if this sister was the same sister who had failed to provide a copy of the lease for her apartment to the Court as required, when that copy of the lease was the only barrier to respondent's reunification with her daughter, respondent disputed that understanding. In conclusion, respondent denied that the Court was considering this petition to terminate her parental rights because she had failed, over a period of years, to provide basic information to the agency or the Court.
The Law Guardian rested without presenting affirmative evidence. All counsel and the Law Guardian presented summations. Respondent argued that she had satisfied every service plan requirement communicated to her but that due to personality conflicts between respondent and various workers and supervisors at the agency, Lakeside had failed to exercise diligent efforts to reunite her and her daughter.[FN7] The Law Guardian and the agency urged the Court to [*10]find that respondent had permanently neglected the subject child. They argued that despite the diligent efforts of the agency, respondent failed to plan for the return of her daughter by failing to comply with specific provisions of the Court's dispositional order which were incorporated into the agency's service plan. The Law Guardian argued that while respondent was very good at fighting the system, having retained or been assigned at least 13 different lawyers in the course of the neglect/TPR proceedings, an Article 78 proceeding, a habeas corpus proceeding, three appellate division appeals, and a federal lawsuit, she had failed over a period of years to expend any comparable effort at meeting the service plan requirements that would have lead to reunification with her daughter.
COURT'S DECISION AT FACT-FINDING
The Social Services Law defines a "permanently neglected child" as " a child who is in the care of an authorized agency and whose parent...has failed for a period of more than one year following the date such child came into the care of an authorized agency substantially and continuously or repeatedly to maintain contact with or plan for the future of the child, although physically and financially able to do so, notwithstanding the agency's diligent efforts to encourage and strengthen the parental relationship...." SSL Section 384-b(7)(a). "To plan for the future of the child" is further defined to "mean to take such steps as may be necessary to provide an adequate, stable home and parental care for the child within a period of time which is reasonable under the financial circumstances available to the parent." SSL Section 384-b(7)(c). Portia J. came into care when she was remanded on the Article 10 case on November 24, 1997. Judge Lubow issued her decision and order at disposition in that case on December 24, 2001. That decision outlines the tortuous four year history of valiant efforts by the Court, the agency and the law guardians to reunite this family. That battle was ultimately unsuccessful, due to the intransigence of respondent, who steadfastly refused to cooperate with any services which might assist in that reunification. The filing of this termination proceeding logically followed the failure of all efforts to reunify the family during the pendency of the neglect.
It is axiomatic that if children are to be reunited with a parent, that family requires a residence to live in. Judge Lubow explained this requirement eloquently to Portia's older brother Eddie, on the record during proceedings on the neglect docket on May 22, 2000:
As I said, the only information that we need is to know that there is a home for you to go to. It doesn't have to be a palace. It doesn't have to be a certain size apartment. It has to be something where I know that you're not going to be thrown out on the street.
It could be a shelter. It has to be someplace where I know that the family has a legal right to be, where I know that there will be food, clothing, heat, air conditioning; that you will have a place to do your homework, someplace that's stable, so that you're not out on the street; someplace where I know that your mother and you and your sister can come home to in the evening and spend time together as a family and do the things that need to be done as a family.
For two years we've been trying to determine whether such a place exists, that we can let you and your sister go home to. In the Matter of Eddie J. & Portia J., supra at 25 quoting Transcript of May 22, 2000, pp. 23-24.
The lack of a residence was still an issue on December 24, 2001, when Judge Lubow issued a decision with respect to the disposition of respondent's 1997 Article 10 proceeding. At [*11]p. 50 of that decision, J. Lubow noted: "...respondent ... did complete a parenting skills course but has otherwise not cooperated nor complied with other ACS/Agency requests or court directives. Fundamental issues pertaining to a place of residence, source of income, family resources physical and mental health, have never been resolved. At the [Article 10] case's inception, respondent and the children were residing in a shelter in Jamaica, Queens. She has since presented alternative residences: one in New Jersey, which caseworkers have twice gone to verify without success, and from which address, mail is redirected to a post office box; and a second, her sister's apartment in the Bronx, for which respondent did never provide a lease, or written or oral authority from her sister to reside in same. Respondent refused offers from the Court and ACS and the Legal Aid Society for housing assistance."
To address this issue at disposition, J. Lubow ordered that respondent provide ACS/Agency with a verifiable address.
Judge Lubow's decision specifically referenced respondent's direct actions forfeiting custody of her children because she refused to cooperate with ACS or the agency, provide a verifiable address and participate in services. On January 12, 1998, the Court granted ACS's application, made with the consent of respondent and the Law Guardian, to parole the children to respondent with ACS supervision and a direction that she cooperate with that supervision. Between January 12 and January 15, 1998, when ACS returned to Court, respondent refused to come and get her children. At that point, ACS reported to the Court, "[w]e don't have an address or residence. She refuses to give that to ACS despite numerous efforts and requests...." Id. at 5 citing Transcript of January 15, 1998 at p. 2 ll. 13-25 (emphasis added). At the close of this proceeding the children were again remanded to the care of ACS.
Moreover, Judge Lubow's decision also reflected specific statements by respondent on the record that she in fact did not reside in the Bronx apartment, "[o]n July 6, 2000, respondent disabused the court of its understanding that respondent had ever actually taken up residence in her sister's Bronx apartment, in the context of explaining that she had no carfare to keep the FET appointments coming from New Jersey." Id. at 29 citing Transcript of July 6, 2000 at p. 6 , l. 14 - p. 9, l. 15.
As of the date of the filing of the petition to terminate parental rights, on October 9, 2002, respondent still had not provided the agency with a verifiable address to which Portia could be released to be reunited with respondent. This lack of compliance can not be considered in a vacuum; it must be evaluated in the overall context of the combined neglect and termination proceedings before the Court. The Court completely credits the testimony of both caseworkers, Intracta Robinson and Roan Tinglin, that on a regular basis over a period, cumulatively, of years, they queried respondent as to where she lived, and never received a coherent, verifiable, answer from her. Indeed, though each of these witnesses was cross-examined extensively by respondent's counsel, all of that examination, and all of the exhibits proffered by respondent as evidence, pre-dated Judge Lubow's opinion in the neglect case. Respondent attempted to prove through cross examination that she had provided a verified address to the agency and ACS prior to the time Judge Lubow issued her opinion in the neglect case. Had that been true, Judge Lubow would not have required that respondent provide a verifiable address as part of the disposition in that Article 10 case.
[*12]
The Court notes that respondent's refusal to provide a residence address continued through her testimony at the fact-finding portion of the instant trial on May 27, 2005:
BY THE LAW GUARDIAN:
Q.Ms. J. ... I would like to start with a basic question: Where do you reside, Ma'am?
A.Well, I I have an apartment, it's I have to, for the return of my child in the Bronx.
Q.Could you give me the address?
A.The apartment I have for the return of my child is (No.) East 181st, Bronx.
Q.And do you live in that apartment?
A. I think I answered that question before.
 . . .
Q. Ma'am, in this apartment, do you live there ....
A.I already went through these questions!
JUDGE RICHROATH: Okay, Ms. J. 
A.I don't have anything further 
COURT OFFICER:Ms. J. 
A. to say.
JUDGE RICHROATH: Ms. J. 
WITNESS:Yes, Ms. Rickroath [ph], I mean, Judge Rickroath?
JUDGE RICHROATH:Mr. D'Addario has the absolute right to cross-examine you. And 
WITNESS: (unintelligible) 
JUDGE RICHROATH: you have the obligation to answer his questions.
WITNESS:I did answer.
BY THE COURT:
Q.And I am asking you, and directing you to answer the question that he asked you: Do you live in the apartment in the Bronx?
A.I have the apartment for the return of my child in the Bronx. That is my answer; if that's not sufficient, maybe you want to arrest me. That's my answer.
. . .
Q.Ma'am. The question is, do you live in that apartment; is that 
A.I 
Q. your residence?
A.I responded.
Q.You haven't responded. You said you have an apartment for the return of your child. Are you keeping 
A.Correct.
Q. and she should live there by herself?
A.I have an apartment for the return of my child, at (No.) East 181st, that is my response. If that's not sufficient, then maybe he wants to make one for me. Or let the caseworker continue lying, making up answers for me.
Q.The question 
A.That is my answer.
Q. is do you live there?
[*13]
A.I, I already responded to that question.
Q.So, the question so the answer is you do not live there.
A.I responded to that question. You can make up whatever you want to 
MS. FRIEDENBERG:Judge 
A. Judge Rickroath [ph], I responded.
Transcript of Proceedings May 27, 2005, pp. 5-8.
It seems incredible that the agency could meet its burden of proof by clear and convincing evidence that a respondent permanently neglected her child by virtue of respondent's failure, over years, to provide even basic information, such as her residence address, to the agency. It seems equally incredible that a respondent would forfeit reunification with her daughter rather than provide that information. Yet, the record before this Court does provide hints at two motives that may have inspired respondent's actions. First, Portia's brother Eddie absconded from care and may well have resided thereafter with respondent. Respondent refused to answer J. Lubow's questions regarding Eddie's whereabouts after the warrant was issued for him during the neglect proceeding. During her testimony at fact-finding on the instant petition, respondent took the 5th Amendment rather than answer a question as to when she had last seen Eddie. If she had harbored Eddie while the warrant was outstanding, it is reasonable to assume that she would not have wanted ACS to inspect her residence.
Second, respondent has been outspoken in alleging that this Court had no jurisdiction to hear this petition because she was certified as a named plaintiff in a federal class action lawsuit, pending in the Southern District of New York, People United for Children, Inc., et.al. v. The City of New York, et.al. 99 Civ. 0648. Respondent provided this Court with a copy of a decision by J. Ward, certifying the class in that lawsuit. In that decision, dated April 21, 2003, J. Ward points out evidence developed by New York City bearing on respondent's lack of credibility, including the existence of a third unnamed child, removed from respondent's care by ACS because she had physically abused that child. Id. at 36. This information, provided to the Court by respondent, certainly provides a second, independent, motive for respondent to hide her residence information from ACS.
In any event, the underlying neglect petition charged respondent with leaving her children alone at a shelter while she went to work. Clearly, a verifiable residence was required for reunification. Respondent refused, from 1998 through 2005, to cooperate with the agency and provide that information. By so doing, she permanently neglected Portia. See In the Matter of the Commitment of Denaysia Shantel C. 266 AD2d 109 (1st Dept. 1999)
At this point in these proceedings, such a refusal has irrevocable consequences. Where does she live? Does respondent have lawful permission to reside in the location in the Bronx she has proffered as a residence "she keeps for the return of her child"? Would respondent live together with Portia if Portia were to be returned to her? Would she commute to McGuire Air Force Base from that apartment? If so, during what periods of time would she be absent from the apartment? Would Portia accompany her somewhere else during these absences, or be left at the Bronx apartment? If Portia were left at the Bronx apartment, would the absences be substantial enough to require alternate care to be arranged for Portia? What would that alternate care consist of? These are axiomatic questions to which respondent has refused, steadfastly, to provide [*14]answers, while the agency has diligently pursued them. A Court cannot conclude that respondent would provide an adequate, stable home for Portia without truthful answers to these questions. An adequate and stable home is a prerequisite for reunification. In the Matter of Lauramarie Addie W. 18 AD3d 472 (2d Dept. 2005); In the Matter of June Y. 128 AD2d 538 (2d Dept. 1987); In the Matter of Michael Dennis C. 121 AD2d 535 (2d Dept. 1986). By her intransigence in refusing to provide the information and/or cooperate with the agency to address the issues, the Court concludes that respondent has permanently neglected her daughter. See In the Matter of Jesus JJ et.al. 232 AD2d 752 (3d Dept. 1996).
In the same way, respondent failed to provide ACS/Agency with a verified income. It is quite clear that the agency could not release Portia to respondent without making sure that respondent had the means to provide for her. See In the Matter of Lauramarie Addie W. supra;In the Matter of Michael Dennis C. supra. The agency worked diligently, over years, to ascertain this basic information. J. Lubow's decision makes clear the lengths the Court went to attempt to verify respondent's alleged military service. The first proof of which this Court is aware is A/C Hallerdan's affidavit.[FN8] However, in the absence of respondent's cooperation, it is unclear the extent of respondent's service in the military (is it full time employment; regular part-time employment; as needed per diem work; what is its expected duration) other than that she possessed military credentials for an unspecified position and she had earned approximately $8000 in the year 2002. While Ms. Hallerdan clearly made valiant efforts to ascertain whether respondent had a verifiable source of income, without respondent's cooperation, a Court can not determine whether respondent has the means to provide for Portia in an ongoing way. If respondent were not employed regularly, the agency could have made referrals for services to address any deficit. However, the absence of information, directly attributable to respondent, made it impossible for the agency to provide services that may have fostered reunification of Portia and her mother.
The bizarre nature of respondent's interaction with the Court and the agency around Portia's stay in foster care fully explained the reasonableness of J. Lubow's direction that respondent receive a full neurological, psychiatric and psychological evaluation and comply with any recommendations that flowed therefrom. It was uncontested that respondent never had such evaluations after J. Lubow's decision was rendered on December 24, 2001. Respondent's counsel entered into evidence a referral by Lakeside for counseling that was dated October 18, 1999. [Respondent's L in Evidence.][FN9] Respondent testified that she had attended a number of sessions with Dr. Maynard, the resource named in the 1999 referral, but she conceded that she never attended an evaluation or therapy with anyone else thereafter.
[*15]
Respondent did visit with Portia, as directed in the dispositional order, and most of those visits involved positive interaction with the child. However, mere visitation, without planning for future reunification with the child, is not a defense to a permanent neglect petition. In the Matter of the Guardianship of Star Leslie W. 63 NY2d 136 (1984); In the Matter of Orlando F. 40 NY2d 103 (1976); In the Matter of Jerry XX. 249 AD2d 597 (3d Dept. 1998).
The Court credited the caseworkers' testimony completely and found that testimony corroborated by the documentary evidence received. Respondent's testimony was self-serving, but in many ways, including respondent's refusal to answer many questions responsively, it corroborated the evidence presented by the agency. Respondent's claims that the agency never asked her for her address, that she had provided her address and contact information to them earlier in the process, that the agency knew where she worked, and had verified information concerning her income, are simply not credible, and therefore are rejected by the Court. However, they are consistent with the claims she has made throughout the pendency of the neglect and TPR cases involving Portia in Queens Family Court. The Court rejects respondent's position and finds that the agency has met its burden of proof by clear and convincing evidence that despite the diligent efforts of the agency to engage her in services necessary to reunite her with her daughter, respondent refused to cooperate for almost four years and therefore permanently neglected the subject child Portia.
EVIDENCE AT DISPOSITION
When this case first appeared on this Court's calendar, respondent attempted on a number of occasions to present photos to the Court, which she alleged depicted a bite to her daughter's breast, permanently disfiguring her. The Court inquired of the agency and the law guardian, and was satisfied that the origin of the alleged injury had been investigated and that the child was not at imminent risk of harm. Since the incident post-dated the filing of the petition in this matter, the Court determined not to address it until the dispositional phase of the case.
At disposition, it was not addressed by any of the parties or the law guardian. However, the Court finds that in the best interests of the child, the Court must take into consideration all material and relevant information available to the Court. Therefore, the Court takes judicial notice of all proceedings which have taken place on this petition or the underlying neglect petition, both prior and subsequent to the filing of the petition to terminate respondent's parental rights on October 9, 2002. This includes a number of reports filed by Lakeside Family and Children's Services with respect to respondent's allegations, various actions she took with respect thereto, as well as reports concerning Portia's stay in foster care and various events that have occurred to her during her stay. FCA Section 625(b). All of these reports were provided to counsel and the law guardian prior to being provided to the Court.
LAKESIDE REPORTS
The Lakeside report dated April 2, 2003 is deemed in evidence as Court Exhibit 1 at Disposition; the Lakeside report dated April 29, 2003 as Court Exhibit 2 at Disposition and a "Progress Report" dated March 10, 2003 deemed in evidence as Court Exhibit 3 at Disposition. These reports document a fight between Portia and the current foster parent's niece, who resides in the foster home, at some point during the week of February 17, 2003. Portia recounted that she and Troy were arguing, Troy pulled Portia's hair, Portia hit Troy and Troy bit Portia on the breast. Portia told Mr. Barksdale from Lakeside, "We fight all the time. Then we become [*16]friends again." Court Exhibit 3 at Disposition at 2.
The same three reports also document an unauthorized visit among respondent, Portia and Portia's brother Eddie J., which took place between March 5, 2003 and March 7, 2003. Eddie approached Portia as she was about to enter school at about 8 a.m. on March 5 and asked her if she wanted to go for McDonald's. Portia agreed to accompany him, but after they went to McDonald's she did not return to school. Instead her brother took her by train to Trenton, New Jersey, where they were picked up by their mother. The foster mother reported Portia missing to the police department on the evening of March 5, and to the agency on the morning of March 6. The foster mother reported a call from respondent at approximately midnight March 6-7, 2003, where respondent wanted to know what had happened that caused her daughter to sustain a bruise on her breast. Respondent brought Portia to the Lumberton Township Police Station on March 7, 2003, to report possible sexual abuse of her daughter. Those authorities contacted ACS and the child was returned to ACS care late in the evening on March 7, 2003.
It is noteworthy that according to the same reports, respondent failed to visit with Portia at the agency between December 10, 2002 and April 8, 2003. Portia reported to the agency in the above enumerated reports that at first, she was happy to see her mother, because it had been a long time since she had last seen her.
Upon her return to care, Portia received a nursing assessment at Lakeside on March 13, 2003, followed up by a doctor's evaluation on March 24, 2003. The reports indicate that on each occasion, Portia recounted the same explanation for the bruise on her breast. The doctor's examination concluded that Portia had suffered no sexual or physical abuse.
Respondent's actions here must be considered in the context of her actions as documented during the pendency of the neglect case. Though for some years while that case was pending, respondent enjoyed unsupervised visitation with her children, that privilege was withdrawn and changed to agency supervised visitation late in 2000. On September 11, 2000, the agency reported to the Court that respondent had kept the children, without authorization, from Friday 10 a.m. until Sunday, 11 p.m. ACS was unable to reach respondent because they had no means to communicate with her, other than paging her and awaiting a return phone call. ACS also had no idea where respondent had taken the children, because ACS had no verified address for respondent. In the Matter of Eddie J. & Portia J. supra at 30.
A Lakeside report dated November 15, 2000 is deemed in evidence at the Dispositional Hearing as Court Exhibit 4 at Disposition. That report documents respondent's lack of compliance with visitation, specifically with respect to her son Eddie, who at that time was also in foster care. Eddie was scheduled to have an unsupervised day visit with his mother on October 7, 2000 from 10 a.m. to 6 p.m. at the apartment in the Bronx. Eddie was awol from placement until 7:30 p.m. on October 9, 2000. Later that week, respondent was paged three times by the caseworker and a number of times by Eddie in the caseworker's presence; respondent did not call back. On October 21, 2000, Eddie left the group home on a day pass and was expected to return the same day at 6 p.m. He was awol all weekend and did not return to care until 7 p.m. on Monday October 23. The caseworker again paged respondent twice with no response from her.
During the same month, while Eddie J. was awol from care, respondent was in contact with his school, requesting that Eddie's belongings be forwarded to her at the Bronx address. On [*17]November 8, 2000, a warrant was ordered for Eddie, and he returned voluntarily on that warrant on November 13, 2000. On November 15, 2000 another warrant was issued when he again absconded from care. In the Matter of Eddie J. & Portia J. supra at 30. Eddie never returned on that warrant, which was vacated in 2003 when he reached the age of 18 and the neglect petition referencing him was withdrawn by the agency.
A Lakeside report dated June 14, 2001, and deemed in evidence as Court Exhibit 5 at Disposition, offers a snapshot of respondent's attendance at agency supervised visitation with Portia. Visits in January 2001 were scheduled for January 21, 27 and 29. Respondent attended the visit on January 21, 2001, but missed the 27th and 29th. In February 2001, Portia reported to the caseworker that her mother was visiting with her at school. The caseworker forwarded copies of the protective orders to Portia's school and that visitation stopped. Respondent visited with Portia on March 17, 22, 24 and 31, only missing a visit scheduled for March 10, 2001. In April 2001, visits were scheduled for April 7, 14, 21 and 28th. Respondent failed to appear for the visits on the 7th, 14th or 28th. Due to a mis-communication, Portia was not produced for the visit on the 21st, though respondent did appear for that visit. In May 2001, respondent visited on May 12 and 26, but did not attend the visit scheduled for May 5 and cancelled the May 19th visit. In June, the caseworker notified respondent that arrangements had been made to send an agency worker so that respondent could attend Portia's dance recital at school. Though the worker attended the performance, respondent did not.
 A Lakeside report dated April 29, 2003 is deemed in evidence as Court Exhibit 6 at Disposition. This report details Portia's positive adjustment to her foster care placement and her significant academic accomplishments. While at the Intermediate School in Queens, she was recognized as one of two top students in the class, and received a scholarship from the TEAK Foundation to attend special summer classes in preparation for attendance at a top rated college preparatory high school the following fall.
 During colloquy outside the fact-finding portion of the case, respondent made applications through counsel complaining that the agency was denying her visitation, or requesting additional visitation. Her complaints became particularly acute during the summer 2004. As a result of that colloquy, the Court became aware that the child was refusing to visit regularly with the mother, because the scheduled visits conflicted with her participation in the TEAK Program and because her mother failed to appear for visits, leaving the child waiting in vain at the agency. It became clear that the child was willing to visit with her mother, if appropriate accommodations could be made to the child's schedule and the visits could be confirmed. The Court attempted to mediate these scheduling issues. However, respondent insisted that she only could visit during time frames when Portia was engaged in activities at TEAK. Moreover, attempts to confirm respondent's attendance at the visit close in time to that visit were hampered by respondent's steadfast refusal to provide any telephone number at which she could be contacted. Respondent insisted that she be notified in writing of a schedule of visits and that she would not appear if she did not have sufficient notice. To address this apparent impasse, the Court ordered a series of make-up visits for after the TEAK Program concluded, but prior to Portia starting school. Respondent was given ample notice of this schedule. It was brought to the Court's attention that respondent failed to attend any of those visits, on at least one occasion, leaving Portia to wait for her in vain, for a number of hours.
[*18]
Later that summer the Court received an application from the Law Guardian for the Court to grant permission for Portia to attend the Peddie School, an exclusive boarding school in New Jersey, with an excellent college preparatory program. The TEAK program had arranged Portia's application to the school, which had accepted her. The agency approached respondent and asked for her permission so that Portia could attend the Peddie School, but respondent refused. The Court brought the matter on before it for a determination of the Law Guardian's motion. Respondent's opposition was limited to her position that the child should not be going to boarding school; the child should be returned to respondent. Over respondent's objection, and with the consent of the agency, the Court granted the Law Guardian's application. An application by respondent for leave to appeal the Court's ruling was dismissed by the Appellate Division, Second Department.
According to a Lakeside report dated November 22, 2004, deemed in evidence as Court Exhibit 7 at Disposition, Portia began the Peddie School on September 11, 2004, and was visited at the school by her brother Eddie on September 12. Portia declined to accompany Eddie to visit with their mother, and respondent began calling the school, allegedly seeking information about the school, its program, its facilities and her daughter's enrollment there. When these contacts were brought to the attention of the Court on September 15, 2004, the Court issued an order of protection providing that respondent was to have no contact with Portia except agency supervised visitation which should be scheduled regularly in a way that would not interfere with the child's schooling. The Court ordered the agency to provide such a schedule of visitation to respondent within one week of the Court's order. The Court also ordered the agency to arrange a school tour and information session for respondent mother.
The same report outlined agency efforts to schedule visitation between Portia and respondent on weekends. The caseworker was in contact with Portia's foster parent, who informed her that Portia did not wish to come home from school each weekend to participate in family visits with respondent. The agency worker was not available the first two weekends in October and during the weekends of October 16 and October 23, Portia had activities at school and stated that she did not wish to have a visit with respondent, but wanted to remain at school to participate in these activities. The agency worker attempted to schedule a visit for the weekend of October 29th; however respondent's pager number was disconnected and although the worker did receive telephone messages indicating that respondent had called her, they did not include a telephone number at which she could return the call. The agency worker did schedule a visit between Portia and respondent for Saturday, November 20th. Respondent did not attend the visit. Instead, Portia, who did attend, went shopping with the caseworker in the vicinity of the agency. During this time shared between Portia and the caseworker, Portia told the caseworker that respondent had tried to contact her on the pay phone in her dormitory. Portia invoked the intervention of her residence director and other administration in the dormitory to intercept these phone calls so she did not have to take them. Portia told the caseworker that her brother had been back to visit her after September 12 (she could not remember the date) and that he had provided her with a cell phone with a walkie-talkie feature, that he told her to use to contact him and respondent. Portia told the caseworker that she had not used the phone for that purpose, and that Eddie had been back in contact with her to tell her he was coming back to get the phone since she had not used it to contact him and respondent.
[*19]
During a Court appearance on November 22, 2004, when the missed visits were brought to the Court's attention, the Court attempted to schedule make-up visits. However, respondent refused to provide the Court with a telephone number at which she could be contacted to schedule and confirm the visits. Given the visits that respondent had failed to attend, the Court declined, under these circumstances, to order any additional visitation.
In a Lakeside report dated February 15, 2005, deemed in evidence as Court Exhibit 8 at Disposition, the agency reported that Portia is progressing well academically and socially at the Peddie School. The Dean of the school reported to the agency that Portia's mother continued to use the pay phone in the dormitory to attempt to contact Portia, but that Portia had enlisted the aid of various school administrative employees to intercept those telephone calls. The agency was in contact with the TEAK Fellowship post-placement coordinator, who contacts Portia on a monthly basis. He reported that Portia had also shared with him her mother's efforts to contact her in violation of the order of protection through the pay phone in her dormitory, and Portia's efforts to evade those telephone calls. The coordinator reported to the agency that Portia had shared with him that she does not wish to have any further contact with her mother.[FN10] The same report noted that Eddie had appeared on the Peddie School campus on January 10, 2005, and had gone to Portia's room looking for her. She was in another room, and when notified that her brother was on campus, she notified school administrative personnel that she did not wish to meet with him. The Dean of the school notified Eddie that his sister did not wish to meet with him, and he was escorted from the school grounds by campus police.
When the Court was made aware that respondent and Portia were no longer visiting, both because respondent has not been amenable to visiting on Portia's school holidays and because Portia has been refusing to visit, the Court instructed the agency to continue speaking with Portia about this issue during its regular contact with her, and if she indicated a willingness to visit with her mother, to arrange such visits, in an agency supervised setting. The Court also continued the orders of protection.
Most recently, on October 26, 2005, the Court became aware that respondent was contacting school officials and threatening them. Based upon these allegations, the Court modified the temporary order of protection providing that respondent was to have no contact with Portia except agency supervised visitation to add "in New York." The Law Guardian, who was in contact with counsel for the Peddie School, was to bring that order to the attention of counsel, who would then seek appropriate orders in New Jersey to address respondent's actions there.
PRESENTMENT AGENCY'S CASE AT DISPOSITION
On its case at disposition, the presentment agency proffered testimony from the current Lakeside case worker, Dana Bazemore. She testified that Portia had resided in the same non-kinship foster home for several years, and that her foster parent wished to adopt her. Ms. Bazemore testified that based upon her conversations with Portia, Portia also wanted to be adopted by her foster parent.[FN11] Ms. Bazeman testified that she visited with Portia regularly and [*20]had observed her in the foster-home setting. She observed a very close, very loving relationship between Portia and her foster mother and between Portia and the foster mother's niece, who also resides in the home. The caseworker reported that Portia was an excellent student with no special needs. The agency had enrolled her in a special program that prepared her for admission to the Peddie School, a prestigious college preparatory boarding school in New Jersey, which she was currently attending. She is an honors student there, has adjusted very well, has many friends and is involved in a number of extra curricular activities. Ms. Bazeman testified that it had come to the agency's attention that on two occasions Portia's biological brother had appeared on campus and when Portia told school officials that she did not wish to visit with him, he was escorted from the grounds. Most recently, this had occurred in January 2005. The caseworker proffered her opinion that Portia's best interests would be served by granting the agency's petition and freeing Portia for adoption by her current foster parent.
RESPONDENT'S CASE AT DISPOSITION
Respondent did not testify as such, but requested and was granted permission to make a statement to the Court. She used that opportunity to chastise the Court for making any determination whatsoever on this proceeding when respondent was a party to a federal proceeding[FN12] which she claimed preempted this Court's ability to adjudicate this case. The District Court's decision, provided to this Court by respondent herself, merely certified the class in that class action suit and approved her as a named plaintiff. Such actions in no way divested [*21]this Court of jurisdiction over this case. Family Court has exclusive, original jurisdiction over termination proceedings brought on the grounds of permanent neglect. SSL Section 384-b(2)(d). It is noteworthy that respondent's statement in no way implicated the best interests of Portia. Again respondent was only concerned about her relationship to the Court. Though the agency and the Law Guardian were given leave, respondent was not cross examined.
CUSTODY PETITION FILED BY RESPONDENT'S SISTER
Respondent's sister, Johneen F., had filed a petition on August 13, 2003, seeking custody of Portia. She testified at disposition that she was ready, willing and able to provide a home for Portia. She stated that she was a retired licensed practical nurse who had worked for 38 years at Creedmore Hospital. She lived in a 4 bedroom house with her mother, who is also Portia's grandmother. Ms. F. testified that she had always gotten along with Portia, although her visiting access to her niece had been restricted recently. She testified that Portia had never visited with her overnight. Moreover, she testified that if Portia told her, face-to-face, that she wished to live with her current foster parent, Ms. F. would allow Portia to go and live with that foster parent.
COURT'S DECISION AT DISPOSITION[FN13]
Portia J. has been in foster care since November 24, 1997, and at this point, has spent more of her life in foster care than she spent residing with respondent. That substantial period of time has weighed on her ability to maintain a parent-child connection with respondent. Indeed, the New York State Legislature and the federal government have recognized the importance of giving children permanency in a timely fashion, by passage of the ASFA legislation. Adoption and Safe Families Act of 1997 (Pub.L. 105-89, 111 Stat. 2115)
During the neglect case and in the early stages of the termination proceeding, Portia eagerly participated in meaningful visitation with respondent. Now, she avoids her visits and has communicated through her attorney that she no longer wishes to see respondent. She has communicated her desire to be adopted by the family she has been living with since 2001.
Reviewing the history of this case as outlined above in the Lakeside reports and Court history, Portia's position is understandable and has an eminently rational basis. In the eight years she has been in foster care, Portia has witnessed respondent's bizarre and belligerent behavior. She has watched her mother place obstacles in the way of their reunification. Portia has waited in vain for respondent when she failed to appear for visits. In stark contrast to this problematic relationship with her biological mother, Portia has thrived in her foster care setting with the pre-[*22]adoptive resource. Portia has assimilated into and became an integral part of that family. She excelled at academic and extra-curricular activities and her foster family has supported her academic achievement and participation in those activities. The agency provided her with enrichment opportunities and she has taken full advantage of them. In short, Portia has made the transition from the pre-adoptive resource as foster care resource to the pre-adoptive resource as family, and she has thrived in their care.
The Court has before it limited information from the Lakeside reports documenting Portia's "visit" with Eddie and respondent in New Jersey in 2003. The parties chose not to address this in the dispositional hearing. However, Eddie's actions bringing Portia to New Jersey to meet with their mother may in fact mark a turning point in Portia's attitude toward reunification. The Court is aware that Eddie went AWOL from care and based upon the Lakeside reports in evidence, is at least in contact if not residing, with respondent. The Court must consider the possibility that Eddie's transporting of Portia to their mother's unknown New Jersey residence was an attempt to convince Portia to join respondent and Eddie without the aid or interference of this Court. If that indeed was its purpose, it failed. Portia returned "home" to foster care. Thereafter, Portia asked that her mother respect her participation in the TEAK program and schedule visits around that program. Respondent refused. Portia asked that her mother grant permission for her to attend the Peddie School. Respondent refused. Subsequent attempts by Eddie to visit with his sister have been rebuffed by her, as have his attempts to bring her to visit unsupervised with their mother.
Portia was effectively, if not legally, abandoned by her mother to the foster care system, while respondent "fought" that system. Portia has been the casualty of that "fight." Respondent has successfully avoided compliance with any reasonable request made by the agency, and with any order made by the Court. From 1997 through the present, she has successfully avoided telling anyone where she lived, what her telephone number is, what her means of support may be. She has successfully avoided complying with a psychiatric/psychological/neurological evaluation, which certainly would have been key in determining services to effectively address respondent's issues. In that success, she has sacrificed her daughter. Portia, quite reasonably, no longer wishes to be reunited with her mother. She wishes to be adopted by the family that has been there for her, that has rejoiced with her in her successes and comforted her in any troubles.
The agency has shown by clear and convincing evidence that it is in Portia's best interests for her care and custody to be transferred to the Commissioner of Social Services and the agency for purposes of consenting to her adoption. Even eight years after Portia was removed from her care, respondent has failed to provide any reasonable plan for reunification with her daughter. The agency still has no residence address for respondent.
Portia wishes to be adopted, and has so stated under oath. The family that has sheltered her since July 2001 wishes to adopt her, and has been approved by the agency as an appropriate adoptive resource for the child. In stark contrast, Portia's aunt, Johneen F., has not visited regularly with Portia, and has never visited with her overnight. While Ms. F. is well-meaning in her efforts to supply herself as a positive kinship resource in her niece's life, even she recognized in her testimony that she had little real connection to her niece, and she admitted, that if her niece told her she would rather stay with the foster family, she would allow that. By her request to be adopted, Portia has so represented to the Court.
[*23]
WHEREFORE, IT IS HEREBY
ORDERED, that the agency's petition is granted. Respondent's parental rights are terminated. Care and custody of Portia is vested in the Commissioner of Social Services and the agency for purposes of consenting to her adoption; and it is further
ORDERED, that Johneen F.'s custody application is dismissed.
SETTLE ORDER.
__________________________________
Marybeth S. Richroath
J.F.C.
Dated: Jamaica, New York
 December 7, 2005

Footnotes

Footnote 1:Portia's brother Eddie J. was also a subject of the neglect proceeding. A warrant was issued for him on that case when he absconded from care. That warrant was vacated and the case withdrawn when he reached the age of eighteen and was no longer subject to the jurisdiction of the New York State Family Court.

Footnote 2:In order to assure itself that the Court was not proceeding with this TPR in violation of statute and caselaw, the Court conducted an in camera examination of the subject child, in the presence of the Law Guardian on August 19 and 31, 2004. Matter of Marc David D. et. al. 20 AD3d 565 (2d Dept. 2005); Matter of Dominique A.W. 17 AD3d 1038 (4th Dept. 2005); SSL 384-b (3)(k). Unfortunately, the minutes of the taped August proceeding found most of the colloquy to be "inaudible." The Court conducted another in camera in the presence of the Law Guardian on February 9, 2005. The sealed minutes for both proceedings are included in the record and the child's testimony at both proceedings was consistent. As a result of these proceedings, the Court was satisfied that it was compliant with appellate mandates as outlined above.

Footnote 3:During the portion of the time Ms. Robinson was the caseworker prior to the rendering of J. Lubow's decision on December 24, 2001, Ms. Robinson's experience was mirrored in colloquy in Court between J. Lubow and respondent. See In the Matter of Eddie J. & Portia J. supra at 15, 16, 22, 23, 29, 30.

Footnote 4:Respondent's C, H and L in Evidence.

Footnote 5:But see In the Matter of Eddie J. & Portia J. at 50, "Respondent refused offers from the Court and ACS and the Legal Aid Society for housing assistance."

Footnote 6:In fact, respondent is a named plaintiff in a class action lawsuit currently pending in the United States District Court for the Southern District of New York, People United for Children, Inc., et.al. v. The City of New York, et.al. 99 Civ. 0648. 

Footnote 7:It should be noted that on September 16, 2003, when respondent first appeared in this Court part, she sought and qualified for appointed counsel. The Court assigned counsel to her on September 22, 2003. On December 15, 2003, respondent brought on an order to show cause, applying for new court appointed counsel. The Court researched the number of attorneys that had represented respondent on the neglect case and in prior proceedings on the termination and determined that respondent had been represented by ten different attorneys in the past, because she made numerous applications to relieve attorneys who had been representing her, both retained and appointed. At disposition on the neglect case, respondent was proceeding pro se. Based upon this history, the serious nature of the termination proceedings before the Court, and settled caselaw that a respondent is not entitled to choose her appointed counsel, the Court denied respondent's application. People v Jessup 266 AD2d 313 (2d Dept. 1999); People v. Medina 44 NY2d 199 (1978). On January 6, 2004, as fact-finding in the instant case was about to start, respondent's counsel informed the Court that her client had "fired" her. The Court conducted inquiry of respondent on the record and discovered that respondent "prefer[red]" another attorney. In view of the same settled caselaw, and the specific history of respondent in this case and the neglect proceeding, the Court denied the applications of respondent and counsel and directed counsel for respondent to begin the trial. On June 29, 2005 respondent brought on an application for judicial action, again seeking new counsel. The Court adjourned the motion for service on all parties and attorneys to August 5, 2005. On that date, the Court again denied the motion, again citing to respondent's history of seeking the counsel of multiple attorneys, and settled caselaw that she does not have the right to choose her appointed counsel. In addition, given that respondent's case was to begin that day, the Court found that respondent's motion at that point in time was a tactic seeking to delay the proceedings. The Court noted the very competent representation respondent was receiving from her appointed counsel. The Court also notes the consistency between counsel's arguments and respondent's testimony and other statements and the colloquy respondent made herself before the Court. 

Footnote 8:The Court received this affidavit, over objection, as Respondent's J in Evidence. Petitioner's objection, which was well grounded, was that the affidavit was prepared on April 28, 2003 well after the petition in this case was filed. Given the seriousness of the instant proceedings, the Court overruled that objection in the interests of justice, seeking to give respondent every opportunity to prove that verifiable income actually existed. 

Footnote 9:It is noteworthy that the referral states that it was hand delivered and that respondent "refused to sign." 

Footnote 10:This was also consistent with the Court's in camera of the child.

Footnote 11:This was consistent with the Court's in camera examination of the child. 

Footnote 12:In fact, respondent is a named plaintiff in a class action lawsuit currently pending in United States District Court for the Southern District of New York, People United for Children, Inc., et.al. v. The City of New York, et.al. 99 Civ. 0648. Class certification under Fed. R. Civ. P. 23 was granted by decision of District Court Judge Robert Ward on April 21, 2003. A fair hearing concerning a proposed settlement of the case was held by J. Duffy on December 5, 2005. It is noteworthy, that in his decision, J. Ward specifically denied the City's request to delete respondent as a named plaintiff, but voiced his concern as to various issues raised by the City, specifically with respect to her as a named plaintiff: "...defendants argue that plaintiff Concita (sic) J. cannot adequately represent the putative class due to her lack of credibility, refusal to answer deposition questions, and lack of knowledge about the case...Defendants provide various examples concerning J.' lack of credibility: J. accepted child support payments through the New Jersey Supreme Court for over four years after her children were removed from her custody; she testified that she is married to her son's father even though she is not actually married to him; she testified that she was never arrested, but later admitted that she had a conviction, which was affirmed by the Third Circuit Court of Appeals; she testified that she had only two children, but later testified that she had another child who was also removed by ACS; she testified that she could not recall ever hitting this third child, but records indicate that she was charged with abuse and using excessive force against this child... The Court is troubled by these examples concerning J.' lack of credibility. Nevertheless, the Court is unable to conclude at this point in time that these examples necessarily pertain to issues central to the claims in this case...Accordingly, at this certification stage, J. may remain as a class representative. The Court notes, however, that it is prepared to tailor or limit the scope of the class later in the litigation, should it become appropriate to do so." Id. at pp. 35-37. 

Footnote 13:On October 6, 2005, Chester G., who identified himself as Portia's father, appeared in Queens Family Court. During her testimony at fact-finding respondent stated that she was married to Mr. J. when both Eddie and Portia were born. When Mr. G. claimed paternity of Portia in a sworn statement on the record, respondent interrupted him, admitting, also under oath, that Mr. G. was the father of Portia. Mr. G. indicated that he was seeking papers from the Court documenting Portia's stay in foster care, because, he stated, he had been paying child support to respondent for that period of time. Mr. G. stated on the record that he was a practicing attorney in North Carolina, married, with his own family. He further state that while he was willing to be a resource for Portia, since she wished to be adopted by her foster parent, he would surrender his parental rights, and allow that adoption to take place. He also admitted that he had had no contact with Portia, herself, for years.